Mr. Frost? I didn't press the mute button, Your Honor. I apologize. May it please the Court. Good afternoon, Your Honors. My name is Robert Frost of Frost Bussard LLC in New Haven, representing the defendant appellant Norman Peters. Your Honors, this is a case involving the seizure of a single baggie of powder cocaine during the course of a motor vehicle stop in Stamford, Connecticut between 415 and 5 o'clock in the afternoon on April 1st, 2016. The baggie of cocaine was seized from Mr. Peters' person after the officer searched Mr. Peters on a public street, reached into his pants below his waistline without gloves, in between his skin and his underwear, and in between his butt cheeks to retrieve what the drugs that they were looking for. The search yielded a wad of tissue with the cocaine inside. Mr. Peters was not resisting arrest at the time of the search, and he was surrounded by at least five different officers and a narcotics dog. At the time, the officer shoved his hands into his pants to pull the item out from between his butt cheeks. The two issues on appeal are the following. The first is whether that sexually intrusive search, even if justified by probable cause or as a search incident to arrest, was broader than necessary without a warrant and went too far. That is, whether it was carried out in an unreasonable manner at that time and place in violation of the Fourth Amendment, or whether it was, as the government claims, a permissible benign reach-in search. Just to be clear, Mr. Forrest, you're not really arguing there needs to be a warrantless nature of the search shifts the burden to the government to show that it was a warrant. I think when you look at the cases and the facts of this case, what's most troubling is not that they searched him, but the manner in which they searched him and how they did it and where they did it. Does the record tell us anything about whether there were any nearby pedestrians or anyone else observing the police action? So I think there is nothing in the record, and I think Judge Bolden cited that fact, but I think there is evidence in the record that it was, and the record does establish, that this occurred on a street where there were residences, and the search itself, in addition to being next to that motor lodge that was on one side of the street, there were houses on the other side of the street. So I don't know if anybody was in a window. Nobody was close in proximity to where the search occurred. That's true. The only people that were close to Mr. Peters as he was searched were the officers and the canines. So the officers are surrounding Mr. Peters, and the one who reaches into his pants is behind him and is reaching into his pants from the rear. Is that correct? I think the testimony is that the officers, the other officers who were present, were standing back by about three to five feet, and that Mr. Peters was placed on the hood of the car and was not surrounded by the other officers, but Officer Phillips, who was the officer who did the search, then approached him and was closest to him. Okay, but it's standing behind him and is reaching in from the rear. That's fair, Your Honor. And in one of the cases that you cite with approval, you say, well, that's a different case than here because they took the person to the parking lot of the police station to do the search. Is that right? Yes. And I guess I'm just trying to figure out how different this street is from that parking lot in terms of degree of privacy. In that case, he wasn't taken inside and searched in a bathroom or a private room or something of the sort, right? In the Williams case, Your Honor? Yeah. Is that what you're referring to? Yes. Well, the parking lot in that case, which in the court, the Eighth Circuit found that it was a close question in terms of the location. But the parking lot in that case was at the precinct and it had squad cars and only police personnel, and it was surrounded by a chain link fence topped by barbed wire and covered with vegetation. And so pedestrians or the public, presumably, would not be able to catch a view or a glimpse of what was happening on the other side of that barbed wire fence. Here, the... Well, there was a fence separated the street where this took place from the motel. And the testimony, it's interesting, there's apparently a picture in the record that shows a chain link fence. And the witness said, but at the time, that doesn't show what it looked like at the time of the search, at which time it was covered by vegetation, just like you described the fence in the parking lot case. Well, there is that testimony, Your Honor. The testimony is also that parts of the fence, you could see through. But it's true that the picture that was being testified about did not have the exact same vegetation because it apparently had been removed at the time of the hearing. But I would disagree that also having been trial counsel and seeing those photos that the setting where this particular search happened would be similar to being inside a police department parking lot behind a chain link fence with barbed wire and vegetation. This was on a public street and there were houses within feet of where this search occurred. I don't... They're correct. There is no testimony of a pedestrian or a group of people standing and watching. Or even though this was right off one of the main... East Main Street in Stanford, which is one of the busiest streets, you take a left and you end up on Home Court where this search occurred. There isn't any testimony of people gathering around to watch this. That's true. If I had that fact, I think the argument would be even stronger, but I don't think that the absence of that fact means that the officers acted reasonably. Could you respond to your adversary's point that there was some safety or destruction of evidence concern that made it reasonable to proceed on this street now as opposed to a more private location? Yes, Your Honor. The district court actually cited to this, I think, in his opinion. The way it was characterized in Judge Bolden's opinion was that Officer Phillips was the one who conducted the search of Mr. Peters in the manner that we criticized. Added that he thought that it was possible that he could push the drugs into his rectum or do something to destroy the evidence. Judge Bolden, the way he characterized it, he said that Officer Phillips' assumption that Peters could dispose of the drugs or do that was not unreasonable. I think that it was not well supported by the record here because there was no testimony that Mr. Peters, surrounded by those officers and the dog and standing next to Officer Phillips, was trying to destroy the evidence at that time. Officer Phillips said he felt the item before he placed his hands into Mr. Peters' underwear, so the risk that Mr. Peters was going to do something at that point was extremely low. Officer Phillips admitted on cross-examination that they had complete control and nothing prevented them from removing him to a more secluded and private location. In fact, he testified rather brazenly that they didn't even consider doing that. I don't think that this record suggests at the time that they did or that Officer Phillips put his hands into Mr. Peters' underwear that there was a likelihood at that point that something was going to happen to these drugs. If that's the case, you're never going to have people bringing people back to the police station or to a more private and secluded area. The officers, if they believe the drugs are there, are going to do what's necessary to get them, notwithstanding that it may subject a person like Mr. Peters to the indignity of having somebody with their bare hand rummaging around in your groin or your butt cheeks, which to me was a bridge too far and there were ways to do this that were more reasonable. Some of the cases have pointed that out. In the cases that we have cited, and even the ones the government has cited in response, the officers, at least in those cases, wore gloves. In some instances, they tried to, as Judge Lynch pointed out, move them to a more quiet or secluded area that was more respectful of the arrestee. Nothing like that happened here. And for that reason, we believe it was an unreasonable search under the Belvey-Wolfish factors, which the parties have discussed in their briefs. Thank you, Mr. Frost. Did you want to briefly address, I think you reserved two minutes for rebuttal, but if you wanted to briefly address the sufficiency point before sitting down? I will do it briefly, Your Honor. I note that the government, as the court knows, submitted a Rule 28J letter citing a decision of a panel of this court, United States v. Archer, indicating that a district court cannot grant a Rule 33 motion based on the weight of the evidence unless the evidence preponderates heavily against the verdict. Obviously, in our briefing, we relied on cases discussing the equipoise rule, and so there does seem to be some tension between the Archer formulation of the standard and the way in which we at least briefed it. I would only add that we did point out in our briefs, and the law is very clear, that a jury cannot speculate. They have to have a reliable enough basis to make an inference, and in this case, the inference was that these 14 grams of drugs were possessed with an intent to distribute them. If those inferences are somewhat speculative, then it would still be appropriate for the court to grant a Rule 33 motion. Thank you, Mr. Frost. We'll hear from the government. Thank you. Good afternoon, Your Honors. Assistant U.S. Attorney Elena Coronado for the government. In this case, the district court did properly deny both of the defendant's challenges. First, it properly denied his challenge to the recent search of his pants in which the police recovered cocaine because that search fully comported to the Fourth Amendment limitations, and secondly, it properly denied his request for a judgment of acquittal or a new trial because the evidence amply supported the offense of conviction here. These rulings were grounded in both law and facts and should be affirmed. Turning now to the first challenge, the search that occurred here was constitutionally reasonable, and, you know, you just heard a little bit about the four-factor test in Bell v. Woolfish. Obviously, the parties have briefed it. I just want to briefly discuss some of the aspects of that test. First, there was ample justification for the search, and just to review a few of the pieces of evidence supporting the search, there was the wiretap that captured the defendant's conversation with his supplier requesting encoded language, the 14 grams of cocaine. Then there was the police surveillance of that drug transaction. Then the officer who actually accepted the stop observed the defendant apparently trying to hide something, and after that, the drug-sniffing dog alerted police to presence of drugs in the area of Mr. Peters' groin, and I should note that that fact alone establishes the necessary probable cause. And then finally, the officer who conducted the search first patted down the defendant on the outside of his pants, and while doing so, he felt the object. So ultimately, this sequence of evidence amply justified the search. Factor two, the location. There was some discussion of this a few moments ago. The testimony established that it did take place in a relatively secluded area, that the area was largely shielded from the Stanford Motor Lodge by high grass, thick bushes, and trees, that there was no evidence that anyone actually observed the search itself, and certainly no evidence that anyone could have seen Mr. Peters' private area, and that there was reason to proceed at that location in particular based on the testimony that the arresting officer was concerned about the defendant's ability to secrete the drugs into his rectal cavity and any danger or harm that could have resulted from that. And then finally, the third and fourth factors, the region search that happened here was both limited in scope and manner. It was unquestionably very brief. There was no visual inspection. There was no removal of clothing. There was no public exposure of the defendant's private areas, and the other officers who were on the scene mere feet away confirmed that there was no removal of clothing. They couldn't see any part of the defendant's private areas. I'll also note that the region search here was reasonable. There isn't, as the parties have indicated, any Second Circuit case law that seems to directly address region searches, but the courts that have reviewed searches that were quite similar in circumstance to this one have come to the conclusion that those searches were lawful. I'd also note that the region search that happened here was not a strip search, and in his briefing, the defendant at least initially tries to characterize the search that occurs here as a, quote, quasi-strip search or, quote, akin to a body cavity type search. That's really not so. Strip search is a term of art, and it requires the removal of clothing to expose private areas to visual inspection, and that's true under Supreme Court precedent and Second Circuit case law and Connecticut law as well, and of course, visual and manual body cavity searches are even more invasive than strip searches, but by contrast here, the search was much less invasive than a strip search, and it was unquestionably less invasive than a body those searches that occurred in the cases that the defendant argues are analogous, and, you know, those are discussed at greater length in our brief. So, ultimately, the search that occurred here comported with the Bell factors. It was lawful, and for that reason, the district court properly denies the defendant's suppression motion, and the government would submit that there's simply no basis to overturn that here. Turning briefly now to the second challenge, the sufficiency of the evidence challenge. Here, the trial evidence considered as a whole was sufficient to support the jury's finding of possession with intent to distribute, and in particular, was sufficient to establish Mr. Peters' intent. I certainly won't reiterate all the evidence mentioned in our brief, but I did want to highlight two pieces of evidence in particular, which were discussed by the district court in its opinion, among other things. First, there was a lack of evidence to support the quantity of cocaine. So, here, 14 grams were recovered from Mr. Peters' person, and the jury heard expert testimony that this quantity is consistent with redistribution rather than personal use. And then, secondly, and probably most importantly— Well, excuse me, Ms. Coronado, wasn't there something equivocal about that testimony, that is to say, it was consistent? I mean, it seems to be a sort of borderline amount, frankly. It's more than most people would have for personal use, but it's a relatively small amount for redistribution. And didn't the government's expert acknowledge that somebody who had a fair amount of money might use this amount in a week or something like that? I believe the specific testimony indicated that an individual might theoretically consume a portion of an 8-ball, which is 3.5 grams of cocaine, over the course of, say, a weekend or perhaps a long weekend. But even that was only a portion of an 8-ball. And again, 3.5 grams is less than a third of the— Of what was here. Right, exactly. I would note that the testimony that was elicited at trial indicated that those were $700, and that they could be broken down into about 140 dime bags or 280 snorting lines of cocaine. And the government's expert indicated that in his experience—and his experience was quite extensive. He had spent 20 years with the DEA, and he had frequently served as an undercover. And he said in his experience that street-level dealers typically buy between 3.5 grams, that 8-ball, and 100 grams, whereas users typically buy, bought a very small amount, either a tenth of a gram up to perhaps a half a gram of cocaine. And that he—I believe he testified that he had never seen a user stockpile cocaine in the way that was being suggested by the defense in his 20 years with the DEA. So, I do think that the quantity speaks towards intent to redistribute. But even more importantly, I would submit are intercepted communications, and in particular, that post-arrest phone call between Mr. Peters and his supplier, Bobby Gutierrez, who was a much larger drug trafficker. And that was a phone call in which Mr. Peters referenced buying the drugs to be, quote, ahead of the game, which suggested a plan to distribute, as the district court indicated in its opinion. There was also discussion—admittedly oblique discussion—about whether perhaps one of Mr. Peters' customers could have kicked off the police. Mr. Gutierrez kind of asked him, did he call anyone? Did he speak to anyone? And then—but then there was also a significant amount of discussion from Mr. Peters on specific law enforcement tactics. You know, the particular unmarked cars that were used, the particular police officers that he encountered. And the district court found, appropriately, that that suggested familiarity that would be really greater than a near-drug user would have had with police tactics. And the whole tenor of the conversation sounds an awful lot like somebody reporting back to his boss or someone higher up in the distribution chain about what the risks are to him. That didn't sound like a user conversation. Exactly. You know, I think that's exactly right. You know, it seemed as if Mr. Peters was trying to kind of warn Mr. Gutierrez about the police investigation. And part of the reason I think it sounded that way, exactly as Your Honor described, is because Mr. Peters was really lucid in the conversation. You know, he didn't seem concerned with the loss of cocaine. He didn't seem to be demonstrating any meaningful need to replace it the way you would think a user would. He wasn't asking for a fix. So the combination of that call, the quantity of drugs, and then there were a number of other pieces of evidence. Well, and the very specific exchange when his supplier is suggesting, as you say, obliquely, that could it have been one of the people you were going to supply to or distribute to. He doesn't say that explicitly, but that's one way of reading. And Mr. Peters' response is, I didn't even have nothing waiting for me, like nothing. And it was then that he said, I was just doing that to be ahead of the game. So your interpretation of that is ahead of the game means he was referring to, he wanted a supply for distribution that he had not yet set up. That's exactly right. That's exactly right, Your Honor. And I think the entire kind of nature of that call, and then of course, the pre-arrest phone call also suggested a familiarity with Mr. Gutierrez, the use of code, the fact that he had access to his drug operation. There were other pieces of evidence as well that were perhaps less important than these, but taken in concert, the use of the prepaid telephone, his ability to conceal the drugs and so forth, all together, and viewed in particular in conjunction rather than isolation as the standard of review requires. The government submitted to the jury then and to the district court and now to this court that viewed against the backdrop of this very deferential standard, the evidence was sufficient to establish Mr. Peters' intent. And in particular, that standard that requires the court to defer to the jury's choice of competing inferences, I would say here has special saliency because the jury was actually specifically instructed to consider a lesser included offense of simple possession. And that simple possession offense, of course, would not require proof of intent to distribute. But yet, even when considering that, the jury specifically found that the evidence did establish intent, and then they convicted him. And there's simply no reason the government would submit to disturb their verdict here. So unless the court has any further questions, thank you. We'll rest on our brief. Thank you. We'll hear rebuttal. Mr. Frost? Thank you, Your Honor. Let me just stress two points. The first, with respect to the fence line and the motel, I just don't want the court to be left with the impression that we're talking about some, you know, vacant lot with, you know, a beat-up old fence, and it's pretty private. The reason why there was a focus on that fence is because right beyond it is a motel with balconies that look down over the street. And I think that there was an effort just to indicate that the sight lines, we don't know how good they were or how poor they were based on that there was a fence with some vegetation. But that was the focus of the fence. On the other side of that fence is a street with houses. So it's not as though we're in some very secluded area where this search is taking place. So I just respect to, you know, the fact that this search, I think government counsel, as they did in their brief, has argued that this was less intrusive and less invasive than if he had been brought back to the police station and asked to submit to a strip search. There are aspects of what happened here that can feel almost more violative than a strip search or a partial strip search back at the police station. And the interaction between the police officer and the suspect could provoke problems and reactions that you might not get in the more controlled atmosphere by a police station or in a place where it looks as though the suspect's rights are at least being around down in your underwear on a public street, I think is highly intrusive. And even Judge Bolden remarked that it was intrusive. I think his issue was it was brief. And that's true. That part of the search was brief. But it was highly intrusive. And I guess one last point, if I have time, is simply that the calls, they were ambiguous. And the conversations, yes, you could read them as a street-level dealer reporting back to his boss, I think, as Judge Lynch mentioned. But if you read those transcripts of those calls, it could be a user reporting back to their supplier so that they can, you know, make curry favor with them or keep them happy. Everybody who is on a phone call talking to their supplier doesn't need to be a complete unintelligible drug addict. If somebody has purchased the drugs and uses the phone to call back and indicate that they had been pinched, and that is the focus of the call, they're not going to tell them all the other concerns that they have at that time. These were sort of the open-ended sort of guesswork that I think we were asking the jury to engage in. And given the ambiguity in the call, we don't think that that carried the government's burden beyond a reasonable doubt. Thank you. Thank you, Mr. Frost. Thank you. Thank you both. Very well argued on both sides. Very helpful.